DANIEL R. MCNUTT (SBN 7815)
MATTHEW C. WOLF (SBN 10801)
CARBAJAL & MCNUTT, LLP
625 South Eighth Street
Las Vegas, Nevada 89101
Tel. (702) 384-1170 / Fax. (702) 384-5529
drm@cmlawnv.com
mcw@cmlawnv.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| TPOV ENTERPRISES 16, LLC, a Delaware Limited Liability Company,<br><br>          Plaintiff,<br><br>v.<br><br>PARIS LAS VEGAS OPERATING COMPANY, LLC, a Nevada limited liability company,<br><br>          Defendant. | Case No.: _____<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff TPOV Enterprises 16 LLC ("TPOV 16") hereby complains as follows:

1.      This action concerns the highly profitable restaurant formed by the parties, and non-party Gordon Ramsay, and defendant's scheme to cheat plaintiff out of its million dollar investment and millions of dollars in profits.  Plaintiff TPOV 16's predecessor in interest invested $1 million in capital related to the development of the restaurant known as "Gordon Ramsay Steak" (hereinafter, the "Steak Restaurant").  The Steak Restaurant has been highly profitable since its opening in early 2012.   Defendant now attempts to wrongfully terminate its contract with plaintiff and to unjustly retain for itself all of the profits and return of capital that are due to plaintiff TPOV 16, all the while keeping the Steak Restaurant open.

## I.      PARTIES AND JURISDICTION.

2.      TPOV 16 is a Delaware limited liability company.  Its sole manager is Craig Green. TPOV 16's membership interests are wholly owned by GR Pub/Steak Holdings, a Delaware limited liability company which is owned, directly or indirectly, by Brian K. Ziegler and Craig Green, as

Trustees of The Seibel Family 2016 Trust, an irrevocable trust, and by Brian Ziegler and Craig Green, and members of their families, in their individual capacities.

3.      Defendant Paris Las Vegas Operating Company, LLC ("Paris") is a Nevada limited liability company.  Its principal place of business is in Clark County, Nevada.

4.      This Court has jurisdiction pursuant to 28 U.S.C § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

5.      To the extent two or more allegations, causes of action, or forms of relief or damages alleged or requested herein are inconsistent or incompatible, each such allegation or cause of action is pled in the alternative, and each such form of damages or relief is requested in the alternative.

6.      For each paragraph, allegation, and claim herein, Plaintiff repeats, re-alleges, and expressly incorporates each and every preceding paragraph, allegation, and claim.

## II.      THE STEAK RESTAURANT IS CONCEIVED, BUILT, AND PAID FOR JOINTLY BY TPOV 16 AND PARIS.

7.      Paris owns the resort hotel casino in Las Vegas, Nevada, known as "Paris Las Vegas."

8.      In or around November 2011, TPOV Enterprises, LLC ("TPOV") and Paris entered a Development and Operation Agreement (as subsequently amended, the "TPOV Agreement") for TPOV to provide capital and services for the design, development, construction, and operation of a restaurant inside Paris Las Vegas known as "Gordon Ramsay Steak" (hereinafter, the "Steak Restaurant").

9.      Simultaneously, and as a condition of entering the TPOV Agreement, Paris entered into a Development, Operation and License Agreement with celebrity chef, Gordon Ramsay ("Ramsay"), relating to the design, development, construction, and operation of the Steak Restaurant ("Ramsay Agreement").  The TPOV Agreement and Ramsay Agreement, which both concern the Steak Restaurant, expressly reference each other and are a single integrated contract.

10.      TPOV and Paris jointly conceived, and built the Steak Restaurant with great success, and the Steak Restaurant remains open to this day.  Specifically, TPOV provided Paris with funding of $1,000,000.00 representing approximately 50% of the costs needed in connection with the design,

development, construction, and outfitting of the Steak Restaurant. In exchange, it was agreed that, after reserves and return to TPOV and Paris of their initial capital, net profits from the Steak Restaurant over a baseline amount were to be split 50/50 between TPOV and Paris.

11.    Pursuant to the Ramsay Agreement, Gordon Ramsay is required to be paid a fee equal to a percentage of gross restaurant sales from the Steak Restaurant.

12.    As a result of the success of the Steak Restaurant, TPOV and Paris have each received millions of dollars annually in the form of capital contribution return payments and profits.

13.    As will be thoroughly detailed below, Paris now desires to wrongfully terminate the TPOV Agreement and the vested rights that TPOV 16 has in the Steak Restaurant and to unjustly retain for itself all of the profits and return of capital that are due to TPOV 16. Paris has not terminated, nor sought to terminate, the Ramsay Agreement. Because the TPOV Agreement and Ramsay Agreement are a single, integrated contract, Paris may not terminate the TPOV Agreement without simultaneously terminating the Ramsay Agreement. Nevertheless, Paris did not terminate the Ramsay Agreement and continues to operate the Steak Restaurant with Ramsay.

14.    The pretext for Paris to wrongfully retain the profits and return of capital that is owed to TPOV 16 is their baseless assertion that Rowen Seibel is an unsuitable person who is associated with TPOV 16.

15.    It is true that Mr. Seibel <u>was</u> a member of the original contracting party and assignor, TPOV. It is also true that Mr. Seibel plead guilty to one count of obstructing or impeding the due administration of the internal revenue laws under 26 U.S.C. § 7212(a). ***However, it is equally true that without any demand from Paris or action from the Nevada Gaming Control Board, TPOV, in an abundance of caution, preemptively did everything possible to protect the business relationship with Paris, including seeing to it that Mr. Seibel divested his interests in the TPOV Agreement by (a) assigning his entire membership interest in TPOV to The Seibel Family 2016 Trust in which he is neither a beneficiary or trustee and (b) causing TPOV to assign its interest in the TPOV Agreement to a newly formed entity TPOV 16 in which Mr. Seibel never had an equity interest or management rights or responsibility further isolating the interests in the TPOV Agreement from***

*Mr. Seibel.*

16.     Critically, at the time of the purported termination of the TPOV Agreement, Mr. Seibel's interest in the assignor, TPOV, as well as the assignee, TPOV 16, was non-existent.

17.     At the time of the purported termination, Mr. Seibel had no association whatsoever with either TPOV or TPOV 16.

18.     Further, when the TPOV Agreement was purportedly terminated, Paris claimed to reject the transfer between TPOV and TPOV 16.  However, Paris had previously expressly recognized the validity of the assignment in its course of performance because Paris followed the directive of the assignment and made all post-assignment payments (until Paris's purported termination) to the assignee, TPOV 16.

19.     Paris' basis for terminating the TPOV Agreement, that Mr. Seibel is an Unsuitable Person, is improper and in bad faith.  Paris' bad faith termination was part of a broader scheme by Paris, its affiliate Caesars Entertainment Corporation ("Caesars"), their affiliates, and Ramsay to force Mr. Seibel out of a number of restaurants for no compensation and to misappropriate the revenues and profits from these restaurants for themselves so that they did not have to share such revenues and profits from these very successful restaurants with Mr. Seibel.

20.     Although it claims Mr. Seibel is "unsuitable," Paris has never been sanctioned, fined, or reprimanded by the Nevada Gaming Control Board, or any other Nevada Gaming Authority, as a result of Mr. Seibel's guilty plea.

21.     Neither Mr. Seibel nor TPOV have ever been deemed "unsuitable" by the Nevada Gaming Control Board.

22.     Subsequent to the assignment to TPOV 16, the Steak Restaurant has continued to operate and generate significant profits and revenue, which have not been impacted in any way by the assignment.

23.     In fact, Paris has not sustained any monetary damages whatsoever as a result of the assignment to TPOV 16 or Mr. Seibel's guilty plea.  Rather, through its patent breach, Paris has enriched itself by retaining the monies due and owed to TPOV 16 as a result of the continued

operation of the Steak Restaurant. As detailed below, the continued operation of the Steak Restaurant is, in and of itself, another breach of the Steak Restaurant Agreement by Paris.

24.    Additionally, Paris' purported termination of the TPOV Agreement is exposed as nothing more than self-serving hypocrisy because Paris, Caesars, and their affiliates selectively choose to do business, directly or indirectly, with convicted felons and known criminals, including but not limited to, the rapper Clifford Joseph Harris Jr., better known as "T.I.", Chris Brown, 50 Cent, professional boxers, and boxing promoters who have extensive arrest and criminal conviction records, and operators of restaurants or clubs, in spite of indictments and/or serious felony convictions (in some cases on multiple occasions) of such parties without any disciplinary action to Caesars or Paris.

25.    The reason for Paris' double standard is rather apparent: by claiming Mr. Seibel is unsuitable and associated with TPOV 16 (which is demonstrably false), Paris thinks that it can enrich itself by keeping the millions of dollars that are owed to TPOV 16; whereas, if Paris or its affiliates terminated its agreements with known criminals, they would lose money through the absence of those entertainment acts and other services.

**A.    TPOV's Initial Capital Contribution and the Structure for Profit Disbursement.**

26.    The TPOV Agreement required TPOV to make an initial capital contribution of $1,000,000.00 towards the development of the Steak Restaurant (hereinafter, the "Capital Contribution").

27.    TPOV made the following Capital Contribution payments to Paris:

| Approximate Date of Payment | Amount of Payment |
| --- | --- |
| 02/15/12 | $195,426.00 |
| 08/14/12 | $589,772.40 |
| 09/19/12 | $30,920.00 |
| 02/04/13 | $128,064.40 |
| 10/16/13 | $55,817.20 |
| *TOTAL SUM:* | $1,000,000.00 |

**B.    The Waterfall Payment Provision in the TPOV Agreement.**

28.    Article 7 of the TPOV Agreement sets forth the terms for compensating TPOV and

Paris.  It contains a waterfall provision specifying the following payments in the following order:

a)      Section 7.1.1 permits Paris to retain from the Steak Restaurant's net profits an amount not exceeding $50,000.00 per year as a capital reserve.

b)      Of the Steak Restaurant's remaining net profits, and as repayment of the capital contribution of Paris and the Capital Contribution of TPOV, Section 7.1.2 requires that TPOV be paid a monthly sum of $1/60^{th}$ of their initial capital account, which in the case of TPOV is $16,666.67 (*i.e.*, one-sixtieth of the Capital Contribution).

c)      Of the remaining net profits, Section 7.1.3 permits Paris to retain a sum equal to one-half the operating income for the twelve months ended September 30, 2011, of the restaurant that preceded the Steak Restaurant in the space at Paris Las Vegas.

d)      Of the remaining net profits, Section 7.1.4 permits Paris to retain and requires that TPOV be paid an "amount not to exceed $1,000,000 in the aggregate, which amount shall be split equally by Paris, on the one hand, and TPOV, on the other hand."

e)      Of the remaining net profits, Section 7.1.5 permits Paris to retain a sum equal to one-half the operating income for the twelve months ended September 30, 2011, of the restaurant that preceded the Steak Restaurant in the space at Paris Las Vegas.

f)      Section 7.1.6 provides that the net profits remaining after each of the above-referenced payments "shall be split equally by Paris, on the one hand, and TPOV, on the other hand."

g)      Under Section 7.2, all payments owed under Article 7 are to be made quarterly.

29.      Under Section 7.1.2, the Capital Contribution is to be repaid over five years (*i.e.*, through sixty monthly installments).  The TPOV Agreement does not provide for Paris to "prepay" the Capital Contribution.  For that reason, the payment provisions in Article 7 were intended to be performed for at least five years.

30.      The first payment by Paris to TPOV was on or around October 22, 2012 and the last was on or around April 15, 2016.  Because the Capital Contribution is being repaid over a period of five years, it is irrefutable Paris has not repaid the Capital Contribution.

31.      In addition to the repayment to TPOV of its Capital Contributions, for all periods that the Steak Restaurant is operating, TPOV is entitled to receive payment of its share of the profits from

the Steak Restaurant due under Article 7 of the TPOV Agreement as referred to above.

**C.      TPOV Assigned the TPOV Agreement to TPOV 16.**

32.      The TPOV Agreement, inclusive of its related amendment, permitted interests in TPOV to be assigned and permitted TPOV to assign its interest in the TPOV Agreement.  In fact, even the individual obligations of Mr. Seibel were allowed to be assigned to another person.

33.      Subsequently and in accordance with the contractually agreed upon rights of assignment, TPOV notified Paris in writing that effective April 13, 2016, (**a**) TPOV's interests in the TPOV Agreement would be assigned to TPOV 16, and (**b**) the direct or indirect membership interests in TPOV held by Mr. Seibel would be assigned to The Seibel Family 2016 Trust, an irrevocable trust.

34.      Specifically, the membership interests in TPOV were assigned as follows: "(1) [a]ll of the membership interests in TPOV previously owned, directly or indirectly, by Rowen Seibel shall be transferred to Brian K. Ziegler and Craig Green, as Trustees of The Seibel Family 2016 Trust. Additionally, the new manager of TPOV shall be Craig Green; (2) [t]he Agreement will be assigned to [TPOV 16] of which the sole manager is Craig Green and all of the membership interests are owned, directly or indirectly, by Brian K. Ziegler and Craig Green, as Trustees of The Seibel Family 2016 Trust, Craig Green, Brian Ziegler, Carly Ziegler and Ali Ziegler (the latter two being children of Brian Ziegler and owning in the aggregate less than 1 %); and (3) [a]ll obligations and duties of TPOV and/or Rowen Seibel that are specifically designated to be performed by Rowen Seibel shall be assigned and delegated by TPOV, [TPOV 16] and/or Rowen Seibel to, and will be performed by, J. Jeffrey Frederick.  The sole beneficiaries of The Seibel Family 2016 Trust are Netty Wachtel Slushny, Bryn Dorfman and potential descendants of Rowen Seibel (none of which exist as of the date hereof). . . . [T]here are no other parties that have any management rights, powers or responsibilities regarding, or equity or financial interests in, [TPOV 16]."

35.      Mr. Frederick is a former vice president of food and beverage for Caesars, has approximately twenty years of experience in the culinary industry in Las Vegas, Nevada, and his qualifications to perform Mr. Seibel's prior duties and obligations are beyond reproach.  Paris has never objected to the fitness of Mr. Frederick.  On the contrary, at or around the time of the

referenced assignments, including the assignment or delegation of duties from Rowen Seibel to J. Jeffrey Fredrick, Paris or its affiliates had engaged Mr. Frederick to perform various restaurant related services for them.

36.     Additionally, pursuant to the terms of The Seibel Family Trust 2016 Trust, each beneficiary of The Seibel Family 2016 Trust is precluded from receiving any benefit from the Trust that comes from a business holding a gaming license in the event such beneficiary was found to be an "Unsuitable Person."

37.     As a result, under the TPOV Agreement, Paris was not entitled to object to any direct or indirect transfer of an interest in TPOV from Mr. Seibel to The Seibel Family 2016 Trust, nor was it entitled to object to the assignment of the TPOV Agreement from TPOV to TPOV 16.

38.     Upon receiving notice of the transfers, Paris did not claim a right to object to the transfers and did not state any objection to the transfers or claim that they were invalid for any reason.

39.     Importantly, Paris acknowledged and ratified the assignment by following the directive of the assignment and thereafter making payments under the TPOV Agreement to the assignee, TPOV 16.

40.     Then, months after acknowledging and ratifying the assignment to TPOV 16, Paris (which defined itself as "Caesars") sent a letter to TPOV purportedly terminating the TPOV Agreement based on its purported rejection of the transfer to TPOV 16 and to the alleged unsuitability of Mr. Seibel.

41.     Critically, at the time of the purported termination of the TPOV Agreement, Mr. Seibel was not associated or affiliated with either the assignor TPOV or the assignee TPOV 16.  As detailed above, Mr. Seibel had previously, and properly, assigned his duties under the TPOV Agreement to Mr. Frederick whose qualifications are beyond reproach.

42.     Because Paris purportedly terminated the TPOV Agreement pursuant to Section 10.2, the arbitration provisions of the TPOV Agreement are inapplicable.

43.     Nothing in the TPOV Agreement provided Paris with the right to object to the assignment of the TPOV Agreement from TPOV to TPOV 16 under the present circumstances.

44.     In addition to the fact that Paris had no basis to object to the assignment and the fact

that Paris waived any right to contest the assignment of the TPOV Agreement to TPOV 16 (because it made payments to TPOV 16 without objection and otherwise performed the TPOV Agreement with TPOV 16), Paris' purported termination of the TPOV Agreement was also invalid because under Section 10.2, because TPOV and TPOV 16 have a contractual right to attempt to cure their association with an Unsuitable Person.

45.     What is patently clear is that Paris does not have any right to (a) summarily terminate TPOV 16's interest in the Steak Restaurant, (b) steal TPOV's capital contribution and/or (c) deny TPOV 16 (while Paris keeps for itself) TPOV 16's share of the earned profits that are being accrued as a result of the operation of the Steak Restaurant that was jointly conceived and paid for by TPOV 16.  The attempt to terminate TPOV's interests in this manner is nothing more than a blatant attempt by Paris to enrich itself at the expense of its business partner.

**D.     Paris May Not Terminate the TPOV Agreement Without Also Terminating the Ramsay Agreement**

46.     The TPOV Agreement and Ramsay Agreement were entered into simultaneously for the purpose of developing, designing, constructing, and operating the Steak Restaurant.  Paris would not have entered one such agreement without simultaneously entering the other.  The two agreements expressly refer to the other and together form a single, integrated transaction and agreement.

47.     The TPOV Agreement does not have a termination date but, with limited exception, contemplates that it would be terminated only if the Ramsay Agreement is simultaneously terminated and the Steak Restaurant closed.

48.     Upon expiration or termination of the TPOV Agreement, Paris is permitted to operate another type of restaurant in the premises where the Steak Restaurant is operated, but is not permitted to operate the Steak Restaurant on such premises.

49.     Paris has not terminated the Ramsay Agreement.  Because the TPOV Agreement and Ramsay Agreement are a single, integrated contract, Paris may not terminate the TPOV Agreement without terminating the Ramsay Agreement.  Nevertheless, Paris did not terminate the Ramsay Agreement and continues to operate the Steak Restaurant with Ramsay in violation of the TPOV Agreement.

50.     Mr. Seibel, TPOV's former member, introduced Paris to Gordon Ramsay and the parties and/or their affiliates agreed to jointly fund, develop, operate, and share the revenues and profits from the Steak Restaurant and other similar steak restaurants and in connection therewith Paris and its affiliate requested, and TPOV and its affiliates agreed, that with respect to all such steak restaurants involving Ramsay, the terms and conditions of the TPOV Agreement would govern TPOV and Paris (subject to certain adjustments inapplicable to the instant situation).  As such, the Steak Restaurant cannot continue to operate without the TPOV Agreement.

**E.     Paris' Decision to Purport to Terminate the TPOV Agreement Was In Bad Faith**

51.     Paris' wrongful purported termination of the TPOV Agreement was part of a broader scheme by Paris, Caesars, its affiliates, and Ramsay to force Mr. Seibel out of a number of restaurants and misappropriate the revenues and profits from these restaurants for themselves so that they did not have to share such revenues and profits from of these very successful restaurants with Seibel.

52.     In January 2015, Caesars Entertainment Operating Company, Inc. ("CEOC") filed for bankruptcy protection under Chapter 11 in United States Bankruptcy Court, Northern District of Illinois, Eastern Division, together with a number of its subsidiaries and affiliates.  Paris was not part of the bankruptcy proceeding.  Thereafter, in or around June 2015, Caesars, CEOC, and their affiliated companies, together with Ramsay, began to make concerted efforts to force Mr. Seibel and his affiliates out of  restaurant ventures they had together, notwithstanding the fact that in some cases, such as the instant case, Mr. Seibel and/or his affiliated entities had invested 50% of the capital required to develop and open the restaurant and the parties had contractually agreed that restaurants of such type could not be operated without Mr. Seibel's affiliated entity that was the contracting party.

53.     For example, in June 2015, CEOC and/or its affiliate Desert Palace, Inc. ("DPI") moved to reject, in the Chapter 11 proceedings, the Development and Operation Agreement between LLTQ Enterprises, LLC ("LLTQ") a former affiliate of Mr. Seibel, and DPI relating to the development and operation of the Gordon Ramsay Pub and Grill at Caesars Palace in Las Vegas for

which LLTQ had invested 50% of the capital required to open the restaurant. When LLTQ challenged the rejection on the basis, among many other reasons, that the agreement between DPI and LLTQ was integrated with the agreement between DPI and Ramsay (and its affiliate) and that DPI could not reject one without the other or keep the restaurant open without LLTQ, DPI sought to reject the corresponding Ramsay agreement and simultaneously obtain court approval for a brand new Ramsay agreement, to the exclusion of LLTQ, that was less beneficial to DPI and its bankruptcy estate than the prior Ramsay agreement. Notwithstanding LLTQ's significant investment, the foregoing acts would rob LLTQ of 50% of the profits from such restaurants to which it was contractually entitled and provide DPI and Ramsay with approximately $2 million per annum that would otherwise be due to LLTQ.

54. CEOC and its affiliate Boardwalk Regency Corporation engaged in a similar scheme to take away the revenue stream of FERG, LLC (a former affiliate of Mr. Seibel) with regard to FERG's interest in the Gordon Ramsay Pub and Grill at Caesars Atlantic City.

55. Another Caesar's affiliate PHWLV, LLC ("Planet Hollywood") engaged in a similar scheme regarding the restaurant, BURGR Gordon Ramsay, (hereinafter, the "BURGR Restaurant") located at Planet Hollywood, Las Vegas.

56. Ramsay and Mr. Seibel are 50% members of a limited liability, company, GR BURGR, LLC ("GRB"), which entered into an agreement with Planet Hollywood regarding the very successful BURGR Restaurant ("GRB Agreement"). As part of their scheme to force Mr. Seibel out and misappropriate the revenues and profits for themselves, among other things, Planet Hollywood and Ramsay agreed, in violation of the GRB Agreement, that Planet Hollywood would pay Ramsay 50% of monies due GRB under the GRB Agreement. Planet Hollywood and Ramsay also conspired and agreed that they would both reject Mr. Seibel's attempt to transfer his interest in GRB to an unrelated entity. Then, after Seibel's conviction became public, Planet Hollywood wrongfully terminated the GRB Agreement on the basis that Mr. Seibel had not transferred his GRB interest and that Mr. Seibel was an "Unsuitable Person." This termination was illusory and in bad faith, and was the sole result of the conspiracy and agreement with Ramsay to force Mr. Seibel out

of the BURGR Restaurant. Based on Planet Hollywood's termination, Ramsay then wrongfully purported to terminate a license agreement with GRB and has filed a dissolution proceeding in Delaware Chancery Court to dissolve GRB based on Mr. Seibel's alleged unsuitability.

57. Planet Hollywood and Ramsay continue to operate the BURGR Restaurant and have been misappropriating the amounts that are due to GRB under the GRB Agreement (of which 50% is due to Mr. Seibel.)

58. As with these other restaurants, Paris's purported termination of the TPOV Agreement was illusory and in bad faith and was done in furtherance of the conspiracy and agreement between Caesars, and it affiliates, including Paris, and Ramsay to force Mr. Seibel out of the Steak Restaurant and misappropriate the revenues and profits for themselves.

59. Specifically, the determination that TPOV and Mr. Seibel are "unsuitable" was made in bad faith.

60. Neither Mr. Seibel nor TPOV nor GRB have been found to be an "Unsuitable Person" by the Nevada Gaming Control Board.

61. Paris has never been sanctioned, fined, reprimanded by the Nevada Gaming Control Board, or any other Nevada Gaming Authority, as a result of Mr. Seibel's prior association with TPOV.

62. Paris has not sustained any monetary damages whatsoever as a result of Seibel's prior association with TPOV.

63. Paris' purported rejection of the assignment of the interests in TPOV to The Seibel Family 2016 Trust and of the assignment of the TPOV Agreement to TPOV 16 were also in bad faith for the following reason. When Paris, after performing in accordance with the assignments for many months, advised TPOV in September 2016 that it was rejecting the assignments, TPOV 16 requested that Paris advise what issues Paris had with such assignments. TPOV 16 (and its affiliates) suggested to Paris that they would work together with Paris (and its affiliates) to make any adjustments necessary so that all parties were comfortable with the assignees. Paris (and its affiliates) ignored the request and suggestion of TPOV 16 (and its affiliates), clearly so that Paris

(and its affiliates) could just attempt to take away the substantial financial interest of TPOV 16 (and its affiliates) in the Steak Restaurant (and other restaurants) to the significant financial gain of Paris (and its affiliates).  Such gain to Paris (and its affiliates) would be in excess of $5 million per year, or greater if additional restaurants were opened.

64.    The purported basis for this termination was illusory and in bad faith, since while Paris was providing notice of termination allegedly because Mr. Seibel allegedly became an "Unsuitable Person," Caesars and other affiliates of Paris were engaged in relationships and were parties to contracts with notorious criminals with long histories of arrests and convictions, including some for violent crimes, the most recent of which appears to be the rapper T.I. whose name is promoted all over Las Vegas as a method to attract people to the club within a Caesars property where he is performing with the obvious hope of the same also resulting in additional casino activity.  Caesars has similarly promoted Chris Brown and 50 Cent, each of whom also has a criminal record.  Even more recently, Caesars has openly promoted the former football player Lawrence Taylor on its official social media as part of a meet and greet at the Alto Bar on February 3, 2017.  Mr. Taylor pled guilty to tax evasion in 1997 and sexual misconduct in 2011.

65.    The purported basis for this termination was illusory and in bad faith, since while Paris was providing notice of termination because Mr. Seibel allegedly became an Unsuitable Person, Caesars and other affiliates of Paris have a long history of contracting with and promoting professional boxers and boxing promoters who had extensive arrest and criminal conviction records to financially gain not just from the boxing matches but also from the additional activity such matches would attract to their casinos.

66.    The purported termination was in bad faith because while Paris improperly claims that an association with TPOV 16 could jeopardize its gaming license, Paris and its affiliates, including CEOC and its Global President Tom Jenkin, proudly boast to the world on social media their association with Chris Brown, a known felon with a long criminal record and a history of probation violation.  The obvious difference is that association of Paris and/or CEOC with Chris Brown potentially brings substantial revenue to Paris and/or CEOC while by claiming they cannot associate

with TPOV 16, Paris can unjustly try to take TPOV 16's share of the profits of the Steak Restaurant of approximately $2.3 million per year.

67.    The purported termination was in bad faith because while Paris improperly claims that an association with TPOV 16 could jeopardize its gaming license, Paris and its affiliates, including CEOC and its Global President Tom Jenkin, proudly boast to the world on social media their association with Gilbert Chagoury who, according to published reports, (a) is not allowed in the United States, having had his visitor's visa denied under terrorism grounds, and (b) has been on a federal terrorist no-fly list.

68.    The purported basis for this termination was illusory and in bad faith, since while Paris was providing notice of termination because Mr. Seibel allegedly became an Unsuitable Person, Caesars and other affiliates of Paris have a long history of continuing to do business with persons under similar circumstances.  Caesars and Paris have in the past contracted with, or remained in contract with parties to operate restaurants or clubs in spite of indictments and/or felony convictions of such parties without any disciplinary action to Caesars or Paris.

**F.    Paris May Not Continue to Operate the Steak Restaurant After Its Purported Termination of the TPOV Agreement**

69.    Of course, while stealing money from TPOV 16, Paris does not deign to attempt to comply with its obligations under the TPOV Agreement.  Specifically, that agreement states that in the event that the agreement was validly terminated (which here, it was not), then the Steak Restaurant must cease operations.

70.    The TPOV Agreement explicitly defines the Steak Restaurant as "the Restaurant."

71.    Upon termination of the TPOV Agreement, Section 4.3.2(a) states Paris is entitled to retain its rights and title to the premises of the Restaurant.  However, upon termination, Paris does not keep any interest in "the Restaurant" itself, but rather, only retains rights to the general restaurant premises.

72.    To avoid doubt, the TPOV Agreement makes clear that upon termination Paris can operate another type of restaurant within the premises, but not the defined Steak Restaurant.

Specifically, Section 4.3.2(d) states that upon the termination of the TPOV Agreement, "Paris shall have the right, but not the obligation, immediately or at any time after such expiration or termination, to operate a restaurant in the Restaurant Premises." (emphasis added). Notably, this Section uses the general phrase "a restaurant," not the defined term "the Restaurant," to state that Paris can operate a different restaurant within the premises, but not the Steak Restaurant.

73.    In order to effectuate the design, construction, and operation of the Steak Restaurant, several contracts were negotiated and executed by the principals of both Plaintiff and Defendant and their respective affiliates in order to create one contractual structure pursuant to which each restaurant would, and does, operate.

74.    In addition to the plain, ordinary, and unambiguous language of the TPOV Agreement, in a separate agreement, Caesars and Paris agreed with an affiliate of TPOV that if they were to pursue any venture similar to the Steak Restaurant, i.e. any venture with Gordon Ramsay generally in the nature of a steak restaurant, fine dining steakhouse, or chophouse, then they could only do so with a TPOV affiliate and only on similar terms as the TPOV Agreement.

75.    Specifically, in 2012, Caesars, through its affiliate DPI and LLTQ, TPOV's affiliate, entered an agreement (the "LLTQ Agreement") concerning the development, construction, and operation of the restaurant known as "Gordon Ramsay Pub and Grill" (hereinafter, "GR Pub").

76.    Section 13.22 of the LLTQ Agreement states: "If Caesars elects under this Agreement to pursue any venture similar to (i) the Restaurant (i.e., any venture generally in the nature of a pub, bar, cafe or tavern) or (ii) *the 'Restaurant' as defined in the development and operation agreement entered into December 5, 2011 between TPOV Enterprises, LLC* (an affiliate of LLTQ), on the one hand, and Paris Las Vegas Operating Company, LLC, on the other hand (i.e., any venture generally in the nature of a steak restaurant, fine dining steakhouse or chop house), Caesars and LLTQ shall, or shall cause an Affiliate to, execute a development and operation agreement on the same terms and conditions as this Agreement, subject only to revisions proposed by Caesars or its Affiliate as are necessary to reflect the difference in location between the Restaurant and such other venture (including, for the avoidance of doubt, the Baseline Amount, permitted Operating Expenses and necessary Project Costs)." (emphasis added).

77.     Section 13.22 specifically survives termination of the LLTQ Agreement, so even if the LLTQ Agreement was properly terminated (which it was not), Paris could not operate the Steak Restaurant without an LLTQ affiliate.

78.     Furthermore, written communications exist in which a representative of Caesars admitted that Caesars and its affiliated entities cannot open and operate any restaurants similar to the Steak Restaurant, the GR Pub, the BURGR Restaurant or other restaurants with British Celebrity chef Gordon Ramsay without the participation of LLTQ or an affiliated entity.

79.     Accordingly, the LLTQ Agreement and the TPOV Agreement preclude Paris from terminating the TPOV Agreement and operating the Steak Restaurant without an affiliate of LLTQ. Yet, to this day, the Steak Restaurant remains open for business and generating millions of dollars annually in profits which are contractually owed by Paris to its business partner TPOV 16.

80.     As a direct and proximate result of the above-referenced events, Plaintiff has suffered millions of dollars in actual damages and such losses shall continue to accrue pending judgment of this matter. But for the above-referenced events, Plaintiff would not have suffered these injuries, losses, and damages.

81.     Plaintiff also is seeking an award of its fees and costs under the fee-award provisions in the TPOV Agreement.  The TPOV Agreement states "[t]he prevailing party in any dispute that arises out of or relates to the making or enforcement of the terms of [the TPOV Agreement] shall be entitled to receive an award of its expenses incurred in pursuit or defense of said claim, including attorneys' fees and costs, incurred in such action."

82.     TPOV 16 also requests an accounting under Section 7.4 of the TPOV Agreement and the laws of equity.  Without an accounting, TPOV 16 may not have adequate remedies at law because the exact amount of monies owed to it could be unknown.  The accounts between the parties are of such a complicated nature that an accounting is necessary and warranted.  Furthermore, TPOV 16 has entrusted and relied upon Paris to maintain accurate and complete records and to compute the amount of monies due under the TPOV Agreement.

### FIRST CAUSE OF ACTION
**Breaches of Contracts**

83.    All preceding paragraphs are incorporated herein.

84.    The TPOV Agreement, the Assignment Amendment and related assignments constitute binding and enforceable contracts between Paris and TPOV 16.

85.    Paris had no basis under the TPOV Agreement to object to the transfer of Mr. Seibel's interest in TPOV to The Seibel Family 2016 Trust, or the assignment of TPOV's interest in the TPOV Agreement from TPOV to TPOV 16.

86.    Paris did not timely object to the aforementioned transfers and/or assignments.

87.    By making payments to TPOV 16 and otherwise performing the TPOV Agreement and in accordance with the assignment to TPOV 16, Paris acknowledged the validity and ratified and consented to the assignment to TPOV 16.

88.    Paris has waived its right, if any, to contest the assignment, and should be legally estopped from contesting the assignment.

89.    Paris breached these agreements by engaging in conduct that includes, but is not limited to, the following:

    a)    Failing and refusing to repay the Capital Contribution due TPOV 16;

    b)    Failing and refusing to pay TPOV 16 the monies due and owing under Article 7 of the TPOV Agreement;

    c)    Purporting to terminate the TPOV Agreement on the alleged unsuitability of Mr. Seibel;

    d)    Continuing to operate the Steak Restaurant following the purported termination of the TPOV Agreement;

    e)    Continuing to operate the Steak Restaurant other than pursuant to the TPOV Agreement or another similar agreement with an affiliate of LLTQ;

    f)    Continuing to operate the Steak Restaurant with Mr. Ramsay;

    g)    Purportedly terminating the TPOV Agreement due to TPOV 16's alleged association or affiliation with an Unsuitable Person when, in fact, TPOV 16 is not associated or

affiliated with an unsuitable person; *and*

h)    Failing and refusing to provide TPOV 16 with a reasonable and good faith opportunity to cure its purported association or affiliation with any unsuitable persons, as contemplated in Section 10.2 of the TPOV Agreement.

90.    As a direct and proximate result of the above-referenced events, TPOV 16 has suffered injuries, losses, and damages in excess of $75,000.00.  But for the above-referenced events, TPOV 16 would not have suffered these injuries, losses, and damages.

91.    TPOV 16 also is seeking an award of its fees and costs under the fee-award provision in the TPOV Agreement.

**SECOND CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

92.    All preceding paragraphs are incorporated herein.

93.    In Nevada, every contract imposes upon the parties an implied covenant of good faith and fair dealing.  A party breaches the implied covenant by (**1**) performing a contract in a manner unfaithful to its purpose and that frustrates or denies the justified expectations of the other party; (**2**) interfering with or failing to cooperate with an opposing party with the performance of a contract; (**3**) acting arbitrarily, capriciously, or in bad faith; (**4**) failing to exercise and perform discretionary powers under a contract in good faith; (**5**) unduly delaying performance or payment under a contract; or (**6**) literally complying with the terms of a contract and therefore not technically breaching the contract but nevertheless violating the intent and spirit of the contract.

94.    The TPOV Agreement, the Assignment Amendment and related assignments constitute binding and enforceable contracts between Paris and TPOV 16 that impose an implied covenant of good faith and fair dealing upon Paris.

95.    Paris breached the implied covenant by engaging in arbitrary, capricious, and bad faith conduct that includes, but is not limited to, the following:

a)    Claiming the assignment of the TPOV Agreement from TPOV to TPOV 16 was invalid and unenforceable after having made payments to TPOV 16 under the TPOV Agreement

and otherwise performed the TPOV Agreement and Assignment Amendment with TPOV 16;

b)     Claiming TPOV and/or TPOV 16 was an Unsuitable Person due to Mr. Seibel's conduct;

c)     Claiming TPOV 16 was directly or indirectly associated or affiliated with an Unsuitable Person without having conducted a reasonable investigation in good faith into the ownership structure of TPOV 16, the identity of TPOV 16's associates and affiliates, and TPOV 16's direct or indirect relationship, if any, with Mr. Seibel;

d)     Failing to have its compliance committee research or investigate TPOV 16 and improperly alleging TPOV 16 did not meet the tests of its compliance committee;

e)     Failing and refusing to repay the Capital Contribution and attempting to retain the Capital Contribution for itself;

f)     Failing and refusing to pay TPOV 16 the monies due and owing under Article 7 of the TPOV Agreement and keeping said amounts for itself;

g)     Continuing to operate the Steak Restaurant following the purported termination of the TPOV Agreement;

h)     Continuing to operate the Steak Restaurant other than pursuant to the TPOV Agreement or another similar agreement with an affiliate of LLTQ;

i)     Continuing to operate the Steak Restaurant with Mr. Ramsay;

j)     Purportedly terminating the TPOV Agreement due to TPOV 16's alleged association or affiliation with an Unsuitable Person when, in fact, TPOV 16 is not associated or affiliated with an unsuitable person;

k)     Failing and refusing to provide TPOV 16 with a reasonable and good faith opportunity to cure its purported association or affiliation with any Unsuitable Persons, as contemplated in Section 10.2 of the TPOV Agreement;

l)     Failing to respond to, and work with, TPOV 16 to arrive at assignees that may have been acceptable to both parties and that would not have resulted in harm to the Steak Restaurant or Paris; *and*

m)      Selectively, arbitrarily, and capriciously choosing to do business, directly or indirectly, with certain persons who are known criminals or convicted felons, including but not limited to, the rapper Clifford Joseph Harris Jr., better known as "T.I.", Chris Brown, 50 Cent, people in the boxing industry, and other restaurant operators, or who are dishonest, immoral, infamous, of ill-repute, or potentially or actually unsuitable.

96.      As a direct and proximate result of the above-referenced events, TPOV 16 has suffered injuries, losses, and damages exceeding $75,000.00.  But for the above-referenced events, TPOV 16 would not have suffered these injuries, losses, and damages.

97.      TPOV 16 also is seeking an award of its fees and costs under the fee-award provision in the TPOV Agreement.

### THIRD CAUSE OF ACTION
#### Unjust Enrichment

98.      All preceding paragraphs are incorporated herein.

99.      By paying the Capital Contribution to Paris and by jointly conceiving, building and operating the Steak Restaurant with Paris and by introducing Paris to Mr. Ramsay, TPOV conferred a benefit upon Paris, and Paris accepted, appreciated, and retained the benefit.

100.    Paris has failed and refused to repay the Capital Contribution, as well as, the quarterly profits that have been earned and are due to TPOV 16.

101.    It would be unjust, unfair, and inequitable for Paris to be permitted to retain the Capital Contribution and said quarterly and annual profits.

102.    It also would be unjust, unfair, and inequitable for Paris not to have to pay reasonable interest on the Capital Contribution and said quarterly and annual profits.

103.    Because of the assignment of TPOV's interest in the TPOV Agreement to TPOV 16, TPOV 16 is entitled to be repaid the Capital Contribution and the quarterly and annual profits.

104.    As a direct and proximate result of the above-referenced events, TPOV 16 has suffered injuries, losses, and damages exceeding $75,000.00.  But for the above-referenced events, TPOV 16 would not have suffered these injuries, losses, and damages.

105.    TPOV 16 also is seeking an award of its fees and costs under the fee-award provision in the TPOV Agreement.

**FOURTH CAUSE OF ACTION**
**Declaratory Relief Under NEV. REV. STAT. § 30 and 28 U.S.C. § 2201-2202**

106.    All preceding paragraphs are incorporated herein.

107.    NEV. REV. STAT. § 30.040(1) states, "Any person interested under [a written contract] or whose rights, status or other legal relations are affected by a [contract] may have determined any question of construction or validity arising under the [contract] and obtain a declaration of rights, status or other legal relations thereunder."

108.    28 U.S.C. § 2201(a) states, "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

109.    28 U.S.C. § 2202 states, "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

110.    Paris's actions have created a justiciable controversy, and this controversy is ripe for adjudication as a declaration by this Court.

111.    TPOV 16 seeks a declaration concerning the following rights, remedies, duties, and obligations:

a)    That (**i**) the assignment of TPOV's interest in the TPOV Agreement to TPOV 16 is valid and enforceable and cannot be challenged, contested, or disputed by Paris; or alternatively, that (**ii**) TPOV 16 is not associated or affiliated with an Unsuitable Person; or alternatively, that (**iii**) TPOV 16's association or affiliation with an Unsuitable Person is subject to being cured and is curable;

b)    That TPOV 16 is entitled to full repayment of its Capital Contribution and all

contractually owed profits from the operation of the Steak Restaurant; *and*

        c)     That Paris is prohibited from operating the Steak Restaurant following the termination of the TPOV Agreement.

112.    Plaintiff further requests any additional relief authorized by the law or found fair, equitable, just, or proper by the Court, including but not limited to attorney's fees, costs, and interest under NEV. REV. STAT. § 30.120 or any other law or agreement allowing the same.

**FIFTH CAUSE OF ACTION**
**Accounting**

113.    All preceding paragraphs are incorporated herein.

114.    The TPOV Agreement permits TPOV 16 to request and conduct an audit concerning the monies owed under the agreement.

115.    The laws of equity also allow for TPOV 16 to request an accounting of Paris. Without an accounting, TPOV 16 may not have adequate remedies at law because the exact amount of monies owed to it could be unknown.

116.    The accounts between the parties are of such a complicated nature that an accounting is necessary and warranted.

117.    TPOV 16 has entrusted and relied upon Paris to maintain accurate and complete records and to compute the amount of monies due under the TPOV Agreement.

118.    TPOV 16 requests an accounting of the monies owed to it under the TPOV agreement, as well as all further relief found just, fair, and equitable.

**III.    PRAYER FOR RELIEF.**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Monetary damages in excess of $75,000.00;

B.    Equitable relief;

C.    Declaratory relief;

D.    Reasonable attorney's fees, costs, and interest associated with the prosecution of this lawsuit; *and*

E.      Any additional relief this Court may deem just and proper.

### IV.      DEMAND FOR JURY TRIAL.

Pursuant to FED. R. CIV. P. 38, Plaintiff demands a trial by jury on all issues so triable.

DATED February 3, 2017.

CARBAJAL & MCNUTT, LLP


*/s/ Dan McNutt*
DANIEL R. MCNUTT (SBN 7815)
MATTHEW C. WOLF (SBN 10801)
625 South Eighth Street
Las Vegas, Nevada 89101
*Attorneys for Plaintiff*